The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hedrick. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. On the date of plaintiff's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant-employer.
3. A one-page personnel note from 26 June 1996, marked as Joint Exhibit Number One, is admitted into evidence.
4. A note from Dr. Artis dated 18 June 1994, marked as Joint Exhibit Number Two, is admitted into evidence.
5. A letter dated 31 May 1995, marked as Joint Exhibit Number Three, is admitted into evidence.
6. A letter dated 17 May 1995, marked as Joint Exhibit Number Four, is admitted into evidence.
7. Ten pages of status reports, marked collectively as Joint Exhibit Number Five, are admitted into evidence.
8. Four pages of status reports, marked collectively as Joint Exhibit Number Six, are admitted into evidence.
9. A Consent and Release Form, marked as Joint Exhibit Number Seven, is admitted into evidence.
10. A letter to Norma Dunn dated 2 May 1995, marked as Joint Exhibit Number Eight, is admitted into evidence.
11. A letter to Tony Smits dated August 1995, marked as Joint Exhibit Number Nine, is admitted into evidence.
12. An OSHA inspection report consisting of thirty-six pages, marked as Joint Exhibit Number Ten, is admitted into evidence.
13. Sixteen pages on entries in a nursing log, collectively marked as Joint Exhibit Number Eleven, are admitted into evidence.
14. A letter to plaintiff with three pages of attachments, marked as Joint Exhibit Number Twelve, is admitted into evidence.
15. A one-page letter to plaintiff dated 7 August 1995, marked as Joint Exhibit Number Thirteen, is admitted into evidence.
16. A two-page letter to plaintiff dated 16 August 1995, marked as Joint Exhibit Number Fourteen, is admitted into evidence.
17. Two pages of medical records from Dr. Wilson, marked as Joint Exhibit Number Fifteen, are admitted into evidence.
18. Four pages of medical records from Dr. Darcey, marked as Joint Exhibit Number Sixteen, are admitted into evidence.
19. Seven pages of medical records from Dr. Bressler, marked as Joint Exhibit Number Seventeen, are admitted into evidence.
20. The first page of a letter to Stephen Camak dated 10 April 1996, marked as Joint Exhibit Number Eighteen, is admitted into evidence.
21. Plaintiff's average weekly wage was $292.00.
 EVIDENTIARY RULINGS
The letters written to Drs. Darcey and Bressler dated 20 December 1996 and the responses thereto, are admitted into evidence. The written interrogatories defendant served on Dr. Darcey and his responses thereto are admitted into evidence.
 ***********
The Full Commission adopts the following additional findings of fact as follows:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a single male, thirty-nine years old. Plaintiff had received no formal education or training after graduating from high school. He served in the United States Army for approximately one year. His employment history consisted of work as an automobile mechanic, car detailer and machine operator.
2. Plaintiff began working for defendant-employer on 16 September 1991. Prior to beginning work for defendant-employer, plaintiff had a history of experiencing cold-like symptoms including, sneezing, nasal and sinus congestion, hoarseness and runny nose. Plaintiff's mother and two of his sisters had asthma and allergies. Prior to beginning work for defendant-employer, plaintiff had attempted to work for a meat packing business. Plaintiff was unable to perform this work because the plant's cold environment aggravated plaintiff's cold-like symptoms. Plaintiff was also unable to run any air conditioning unit in his home due to the fact that cold air aggravated his cold-like symptoms or vasomotor rhinitis.
3. When he began working for defendant-employer, plaintiff's job title was "assembler". Plaintiff worked on a production line that assembled dishwashers. One of plaintiff's primary responsibilities was to box finished products. While working in this position, plaintiff complained to his supervisor, Mr. Fricke, that blowing air was causing him to experience cold-like symptoms. Plaintiff worked for defendant-employer until 5 October 1992, when he took a voluntary lay-off from defendant-employer. Plaintiff returned to work for defendant-employer on 15 February 1993.
4. When he returned to work, plaintiff worked in a position where he rotated work duties every two hours. One of his duties in this position was to place insulation around dishwashers. Plaintiff tore pieces of insulation from a large roll and attached it to the dishwashers. The insulation was made of fiberglass and contained urea-phenol-formaldehyde resin.
5. After returning to work in 1993, plaintiff's cold-like symptoms increased. His symptoms were exacerbated by temperature extremes and working in areas where air was circulated by portable fans or air circulation vents. Defendant-employer's plant was equipped with an air circulation system with vents that blew air into the various work stations. Many work stations received blowing air from portable fans that were placed about the plant. When working in areas where air from the plant's ventilation system blew directly onto him, plaintiff was known to use a broom handle to close the vents or to adjust them to direct the air flow away from him.
6. Plaintiff presented to defendant-employer's medical clinic on 11 August 1993. On that date, plaintiff's nose was running, he was nauseated and he had a headache and sore throat. The following day, he was somewhat improved and he was no longer nauseated.
7. Plaintiff continued to work in the rotation position through 24 September 1993, when he took a voluntary leave of absence. Plaintiff returned from his leave of absence on 1 October 1993. Plaintiff continued to work for defendant-employer through 13 December 1993 when he took another voluntary lay-off. Plaintiff returned from his voluntary lay-off on 7 March 1994. When he returned to work on that date, plaintiff was assigned to the "inner door" department. Plaintiff's symptoms were less severe while working in this department. However, when he was in an area where there was blowing air he continued to sneeze. Plaintiff worked in this position for approximately nine months.
8. On or about 18 June 1994, plaintiff presented to Doctor's Urgent Care in Goldsboro. On that date, plaintiff had sinus congestion. Dr. Artis wrote a prescription note which stated that plaintiff's sinus condition was "aggravated by certain chemicals and temperature changes." The note further stated that plaintiff should avoid these conditions and that he should also avoid direct air flow.
9. On 6 September 1994, plaintiff took a voluntary lay-off. He returned to work for defendant-employer on 12 September 1994. When he returned to work on this occasion he was assigned to work in the service parts area. While working in this position, plaintiff's cold-like symptoms occurred only when the temperature in the plant was hot or cold.
10. On 26 January 1995, plaintiff took a medical leave of absence. He returned to work on 6 February 1995 and was assigned to a new work area. Plaintiff worked in this new position for only two hours because he experienced a recurrence of his previous symptoms. Plaintiff reported this recurrence to defendant-employer's company nurse. Plaintiff did not return to work for defendant-employer after that date. Plaintiff did not request work in another area although he had been moved at his request in the past.
11. On 26 January 1995, plaintiff presented to Dr. Wilson upon referral by Dr. Artis. On that date, plaintiff's nose was moderately congested. Dr. Wilson prescribed medications and recommended that plaintiff undergo testing for allergies. The medications prescribed by Dr. Wilson failed to improve plaintiff's condition. By 8 February 1995, testing had determined that plaintiff was allergic to some weeds, grasses, trees and cockroach allergen. He was not allergic to molds or dust mites. Dr. Wilson referred plaintiff to Duke University Medical Center for additional testing.
12. On 15 March 1995, plaintiff was evaluated by Dr. Bressler. In his written report, Dr. Bressler suggested that defendant-employer's premises be inspected or tested for the presence of formaldehyde.
13. On 2 May 1995, Mr. Ching, an employee of defendant-employer, performed air quality tests inside the plant where plaintiff worked. Mr. Ching was a regulatory affairs engineer, had received a Masters degree in chemical engineering and had twenty-five years of experience as an industrial hygienist. The tests were designed to determine levels of formaldehyde and toluene. The tests conducted by Mr. Ching on that date revealed undetectable levels of formaldehyde and toluene. Mr. Ching returned to defendant-employer's plant on 12 June 1995 and conducted additional, more extensive air quality testing. These tests measured formaldehyde and carbon monoxide levels over a period of eight hours. Formaldehyde was present in two areas. The greatest concentration measured was 0.046 PPM (parts per million). The formaldehyde level allowed by OSHA was 0.50 PPM. Carbon monoxide was measured in multiple areas. The highest level of carbon monoxide measured was 20 PPM. The carbon monoxide level allowed by OSHA was 50 PPM. Formaldehyde was never present at more than trace or negligible amounts. Trace elements of formaldehyde can be found outside of a factory environment where formaldehyde is used such as in a carpeted area or near wood paneling.
14. On 26 May 1995, the North Carolina Department of Labor, Division of Occupational Health and Safety, conducted an inspection of defendant-employer's plant based upon plaintiff's complaint that he was experiencing excessive sneezing, coughing, runny, bloody nose and puffiness around his eyes and face. No other employee who was interviewed during the inspection reported experiencing similar symptoms. The inspector did not find employees using products that contained chemicals or solvents in ways that would subject them to overexposure.
15. Plaintiff next presented to Dr. Bressler on 17 July 1995. Since being out of work, plaintiff's symptoms had improved, but he continued to experience sneezing and a runny nose, especially with weather and temperature changes. Dr. Bressler found plaintiff had a definite allergy to cockroaches. The Frigidaire plant had never been tested for cockroach allergens.
16. In August 1995, plaintiff was evaluated by Dr. Darcey. Dr. Darcey recommended that plaintiff receive testing to determine whether he would have a positive allergic reaction to formaldehyde.
17. On or about 19 August 1995, plaintiff was tested for IGE (formaldehyde) antibodies and exhibited a positive reaction.
18. Based upon the test results and his understanding of the situation and work environment at the defendant-employer's plant locale where plaintiff worked, Dr. Darcey concluded that plaintiff's rhinitis was exacerbated by his exposure to chemical irritants especially formaldehyde and that plaintiff's employment placed him in a position of an increased risk compared to members of the general public who are not so employed for aggravation of his rhinitis. In reaching this conclusion, however, Dr. Darcey relied on facts not in evidence. Dr. Darcey cited plaintiff's exposure to chemical irritants (predominantly formaldehyde) including dusts, vapors, mists and aerosols as responsible for plaintiff's condition. Neither plaintiff nor any other witness discusses the existence of dust, vapors, mists or aerosols of any kind or amount in the Frigidaire plant. Plaintiff asserts he reacted to blowing air, particularly cold air which he believed contained formaldehyde. Only after conducting time exposure air quality tests did the regulating engineer at Frigidaire find trace elements of formaldehyde.
19. According to Dr. Bressler, who took an extensive medical history of plaintiff, employment with Frigidaire did not place him at an increased risk of developing or significantly aggravating his vasomotor/non-allergic rhinitis as compared to members of the general public who are not so employed.
20. Plaintiff's absence from work is a result of his own choice. According to Dr. Bressler and Dr. Darcey, plaintiff is capable of working and earning wages and is not incapable of continuing his employment at Frigidaire due to his rhinitis.
21. Due to the fact that Dr. Darcey relied on facts not in evidence regarding the existence of chemical irritants in the form of dusts, vapors, mists and aerosols at defendant-employer's plant, the undersigned relied more heavily upon the expert opinion of Dr. Bressler than that of Dr. Darcey in reaching conclusions regarding plaintiff's alleged occupational disease.
22. As of the date of the hearing, plaintiff continued to experience cold-like symptoms three days per week. Since leaving his employment with defendant-employer, plaintiff had not sought employment with any other employer.
23. Plaintiff's cold-like symptoms were caused by vasomotor rhinitis which preexisted his employment with defendant-employer. Although his symptoms may have been aggravated from time to time by his employment with defendant-employer, his employment with Frigidaire did not place him at an increased risk of aggravating that condition as opposed to members of the general public not so employed.
 ***********
Based upon the findings of fact, The Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The aggravation of plaintiff's vasomotor rhinitis was not due to causes and conditions that were peculiar to and characteristic of his employment with defendant-employer, and therefore, was not an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff is entitled to no compensation under the North Carolina Workers' Compensation Act.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DENIED.
2. Each party shall bear its own costs, except that defendant shall pay Dr. Darcey $150.00 as an expert witness fee for time he spent responding to the inquiry from the undersigned. In addition, defendant shall pay Dr. Bressler $180.00 as an expert witness fee for time he spent in responding to the inquiry from the undersigned.
 S/ ________________ MARY MOORE HOAG DEPUTY COMMISSIONER
CONCURRING:
S/ _______________ BERNADINE BALLANCE COMMISSIONER
DISSENTING:
S/ _______________ THOMAS J. BOLCH COMMISSIONER
MMH:db